## JACK DILLARD MATTHEWS *v.* STATE OF MARYLAND

[No. 172, September Term, 1969.]

*Decided February 16, 1970.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*J. Seymour Sureff* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and

*Robert C. Stewart, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Jack Dillard Matthews, the appellant, was indicted by the grand jury of Baltimore City on four counts: (1) burglary; (2) rogue and vagabond; (3) grand larceny; and (4) receiving stolen goods of the value of $100. The case was tried before Judge Shirley B. Jones without a jury in the Criminal Court of Baltimore. The trial court granted Matthews' motion for a directed verdict at the conclusion of the State's case with respect to the first, third and fourth counts of the indictment apparently because the State had failed to prove value and because the State had failed to prove the vacant apartment was a dwelling. See *Arnold v. State,* 7 Md. App. 1, 252 A. 2d 878. He was, however, convicted of being a rogue and vagabond under the second count and sentenced to a term of three years.

Matthews contends: (1) since he committed a completed crime he cannot be convicted of being a rogue and vagabond under *Crossland v. State,* 252 Md. 70, 249 A. 2d 153 and (2) in the alternative that the evidence was insufficient to show an intent to steal.

Scott E. Smith, the elevator operator at the apartment house at 101 East Mount Royal Avenue at 7:30 or 7:35 P.M. on October 3, 1968, heard noises from the areaway leading to the basement. Investigating the noises, he found the appellant Matthews with a portable television followed by Karen Miche, a codefendant, on the stairway. In response to Smith's inquiry, Karen Miche said she was taking her television set. Smith summoned Erica Taber, the resident manager.

Taber, upon being called by Smith, went to the basement of the building to investigate. She found Karen Miche standing alone with an RCA portable television at her feet. The television was similar, if not identical, to the televisions furnished with the apartments. Taber

said Karen Miche responded to her questions by saying that it was her television, that she had purchased it from the former occupant of apartment No. 472, that she had entered the apartment by means of a key and that she had a receipt for the television, which she offered to show, but did not produce. Mrs. Taber knew that Karen Miche did know and visit the former tenant of apartment No. 472, but she testified the tenant had no authority to sell the television. Mrs. Taber called the police, and then went to apartment No. 472 where she discovered the apartment lock had been broken; this lock had been replaced one week earlier and had been intact the previous day. Mrs. Taber observed scratch marks on the apartment door; inside the apartment she discovered the television set from that apartment was missing. Upon further inspection of the basement, Mrs. Taber found that a basement window, which could only be opened from the inside, had been opened. The door to the outside, which was kept locked, had been unlocked. There were no apartments in the basement, only locked storage areas.

Mrs. Taber observed Raymond Miche (another codefendant and husband of Karen Miche) in the hallway to the first floor lobby as he appeared to come from one of the basement exits. Miche joined his wife in the lobby, she having come upstairs. Mrs. Taber saw the appellant for the first time standing with the Miches in the first floor lobby, but she did not know from where he had come. All three defendants left together and walked south toward St. Paul Street before the police arrived.

Officer James Howell of the Baltimore Police, responding to Mrs. Taber's call, arrested the appellant and the Miches on St. Paul Street. He examined the apartment door to No. 472 and observed the markings.

Appellant Matthews, testifying in his own defense, said he and the Miches stopped at 101 East Mount Royal Avenue to look for a friend named Gene Hunter who they thought might live there. Matthews claims he talked with Scott Smith, who looked unsuccessfully for Hunter's

name on the mailboxes. After that, he and Ray Miche waited outside while Karen Miche went to the ladies room. After Ray Miche had reentered to get his wife, appellant attempted to reenter but the door was locked. Smith, with some reluctance, finally permitted appellant to reenter, where he found Mrs. Taber and Karen Miche discussing the theft of a television set. After some discussion, Mrs. Taber allowed them to leave. He denied being in the basement or seeing a television.

To repeat, appellant contends that since he committed a completed larceny, he cannot be convicted of being a rogue and vagabond. As controlling authority, he cites *Crossland v. State, supra,* wherein a rogue and vagabond conviction was reversed, the Court holding the conviction should have been for the completed larceny. Despite some similarities in substance and procedure between *Crossland* and the instant case, closer inspection reveals that the logic and result of *Crossland* were closely tied to its specific facts; since these specific facts are absent from the instant case, it is not controlled by *Crossland*.[1] For purposes of considering interrelationship of larceny and the rogue and vagabond statute, it is crucial to note that the analysis in *Crossland* does not begin from the time the larceny was technically complete, *i.e.,* when the evidence showed the slightest asportation of the stolen goods from their resting place, *Clark and Marshall, Law of Crimes,* § 12.05, but when the accused left the premises with the stolen goods in his possession. Although a larceny may be technically complete prior to an accused's departure from the owner's premises, his possession of the stolen property at that time is tenuous and subject to interruption. For *Crossland* to apply, the larceny must be at a practical as well as a legal end. In *Crossland* the asportation, when interrupted, was already beyond the "enclosed yard or garden or area belonging to any house" referred to in § 490 of Article 27, Md. Code.

---

1. The Court referred to "the unusual facts" and the "unusual circumstances" several times in the opinion.

716

As to Matthews' contention that there was no intent to steal, there was evidence that the apartment from which a television set was removed had been forcibly entered. He was discovered with the stolen merchandise actually in his hands. It is difficult to imagine a set of facts which would more clearly establish an intent to steal. As pointed out above, his possession was not so complete that we can say, as the Court did in *Crossland,* the possession of the stolen goods merely evidenced a past intent to steal.

*Judgment affirmed.*