GERALD PAUL JETT *v.* STATE OF MARYLAND

[No. 436, September Term, 1970.]

*Decided August 4, 1971.*

The cause was argued before MURPHY, C. J., and ANDERSON and ORTH, JJ.

*Barrett W. Freedlander* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Howard L. Cardin, State's Attorney for Baltimore City* and *William R. Lenhard, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Gerald Paul Jett, now committed to Patuxent Institution as a defective delinquent, was granted a belated appeal by order of this Court from the judgment on his conviction on March 8, 1967 in the Criminal Court of Baltimore of being a rogue and vagabond. Shortly before the case was argued before us we decided *Greene v. State,* 11 Md. App. 106, holding that Code, Art. 26, § 70-1 (c), insofar as 16 and 17 year old children in Baltimore City are treated differently from all other children of the same age in the State, is invalid. Jett had not reached the age of 18 years when the offense of which he was convicted was committed and at the time of his

trial was not considered to be a juvenile in Baltimore City. So we remanded the case without affirming, reversing or modifying the judgment with direction to the lower court to determine whether or not the Juvenile Court had waived jurisdiction by a proper procedure before the original trial and if it had not, a waiver hearing was to be conducted in accordance with the present provisions of Code, Art. 26, § 70-16. Upon such hearing if the Juvenile Court waived jurisdiction, the record was to be returned to us for determination of the issues presented on the belated appeal. The record has now been returned to us. It contains an order dated 8 June 1971 of the Circuit Court of Baltimore City, Division for Juvenile Causes, waiving jurisdiction over Jett under the provisions of Code, Art. 26, § 70-16 and remanding him to Patuxent. We note that Jett was afforded the advantage of having the question of the waiver of him determined under the more specific provisions of the current statute and rule. See *Wheeler v. State,* 10 Md. App. 624.

Jett attacks the sufficiency of the evidence to sustain his conviction of being a rogue and vagabond. He asks "whether the undisputed facts legally constitute the offense" and "indicate the existence of the requisite intent to steal."

Only two witnesses testified at the trial and they appeared on behalf of the prosecution. Juanita Kessler said that on 17 January 1967 she lived at 4731 Reisterstown Road in Baltimore City. About 1:00 P.M. she was in her kitchenette on the first floor rear of the house baking a cake. She saw Jett walking down the alley. "He looked peculiar. I just kept watching him. So finally he started up to the door * * *. He came through my gate up through my yard to my porch. * * * So when I see that he was coming up onto the porch I went into the bedroom. * * * I went in there and he then knocked on the door. * * * So I wouldn't answer the door, and he pounded and pounded. I still didn't answer. So then, finally, he had ahold of the doorknob, jiggling the door. So then I didn't, still didn't answer and I could see from

the shadow on the dining room floor that he walked away.[1] * * * I went right to the kitchen door that leads into the dining room, and stood there and watched him. And then he left my yard, went through the gate directly across the alley into the next yard. * * * And then he went up to that porch and did the same thing, knocked on the door, shook the door handle. And then apparently there must have been a window on this porch, I do not know, but he looked like he was peering through a window. * * * Then he went down off the porch, went down through a cellar way, which I could see directly across and he was there for a few seconds. And then he then came back up out of that basement, headed toward my gate again and started through the yard. So then, instead of going into the bedroom again, I just went into the dining room and stood behind the wall. In that time he didn't knock, he just jiggled the door. So then after that I just stayed there and I could see on the shadow of the floor like I said before that he had left the porch. And then I could hear him leave. So when he left, then I waited for a second or so, and then I looked out the door and he was going down through the yard. Instead of going out of the yard he bent down and picked up something. At that time I didn't know what it was. I then seen him draw his arm back and I ducked back. And then, all I know, I heard the window break and the blind flew up and the curtain fell and everything. So I waited and he walked on out the gate and stood at the end of the gate. And I went to the door, the broken glass, and I told him that if he didn't leave I was going to call the police. Then he came back to the gate and started through the yard again. So I went to the bedroom, picked up my little gun on the dresser, went from the bedroom into the living room to where my phone was. I called the police and while I was dialing the police, they were connecting me with the cruiser, he kept hollering 'Don't call the

---

1. Asked why she did not answer the door Mrs. Kessler said, "Because I was not dressed properly, and I just didn't care to let him in."

cops', over and over and over. So then finally his voice changed, his attitude changed. He said, 'You'd better not call the cops'. So at that time I looked out and he did have his hand through the window. * * * On to where the bolt is, this way. * * * And then I don't know whether he seen the gun in my hand, which is possible from the distance, but he then left my porch." The police arrived immediately thereafter. She knew Jett—his family once lived in the same apartment house she lived in—and she gave the police his name and a description of him.

Officer John Sykes responded to the call. Mrs. Kessler told him what had occurred and gave him Jett's name and description. The police cruised around the neighborhood and saw Jett. "When he spotted the radio car he started running and my partner and myself pursued him about half a block and he was apprehended in the rear of 4813 Reisterstown Rd."

Rendering its decision the court said:

> "Because of the fact of omissions in the testimony which are essential to the proof required under the first and second counts, and the omission in the second count itself of ownership of chattels alleged, the Court cannot find the defendant guilty of the first and second counts, but does find him guilty on the third count." [2]

The third count charged Jett with being a rogue and vagabond. Since it was clear that he was not apprehended possessed either of implements or offensive weap-

---

2. The 1st count charged that Jett "* * * in the daytime, unlawfully did break the dwelling house of Wanetta Kesler there situate, at 4731 Reisterstown Road with intent to steal, take and carry away therefrom, the goods and chattels, monies and properties, of value * * *." The 2nd count alleged that Jett "* * * did unlawfully attempt to unlawfully break the dwelling house in the daytime, of Wanetta Kesler, there situate to wit: 4731 Reisterstown Road, in said City, unlawfully to steal, take and carry away the goods and chattels of value therein found, and in furtherance of said attempt, did throw a rock through the rear kitchen door window of said dwelling house, in an attempt to enter, * * *." The name is given as Juanita Kessler in the transcript of the proceedings.

ons, the conviction must rest on him being found in or upon a dwelling house, or in an enclosed yard or garden or area belonging to any house, with an intent to steal any goods or chattels. The intent may be to commit either grand or petit larceny. Code, Art. 27, § 490 as construed in *Downes v. State,* 11 Md. App. 443, 445-446.

Jett first attempts to apply the holding in *Crossland v. State,* 252 Md. 70, arguing that the intended offense was a *fait accompli* because he had broken the window and thrust his hands through the break. But it was the larceny in *Crossland* that had been consummated and not simply a breaking and entering. We think it patent that a person may be found in or upon a dwelling house with an intent to steal even though he has broken and entered the premises; the breaking and entering may be steps toward the commission of a larceny but the stealing of goods in the dwelling would yet remain to be done. The intent to steal is not obliterated by the breaking and entering. Here Jett stole no goods and the *Crossland* holding is not apposite. *Knight v. State,* 7 Md. App. 282, 286. See *Matthews v. State,* 8 Md. App. 712.

Jett next questions the proof of an intent on his part to steal any goods. He offered no testimony so the evidence offered by the State was not contradicted or refuted. It showed that he was upon the premises of Mrs. Kessler and upon the premises across the alley from her house. In both he knocked on the door and shook the door handle. When he came back to Mrs. Kessler's door the second time he "jiggled" it and then started to leave. While still in the yard he threw a brick through a glass pane in the door and then walked to the gate leading into the yard and stood there. He did not come back to the house until Mrs. Kessler told him that if he did not leave she would call the police. He implored her not to call the police and then threatened her. It was when he threatened her — "You'd better not call the cops"—that he reached through the broken pane toward the door bolt. By that time Mrs. Kessler had a gun in her hand. While she did not know whether or not he saw the gun she said

"it was possible from the distance." In any event he left. When the police cruiser approached him shortly thereafter he fled.

Intent is subjective and it is not often that the State can produce direct evidence of it. But it may be inferred from the circumstances, *Mason v. State,* 2 Md. App. 768, 770. The question is whether the circumsta..es here supported a rational inference that Jett was upon either of the premises with an intent to steal. The court found "omissions" in the testimony which were essential to the proof required to establish a breaking of Mrs. Kessler's house with intent to steal. Although the court did not set out the omissions, it seems that they could only go to the intent requirement. That Jett broke her dwelling in the daytime was clear. We can only conclude that the court found as a fact that Jett did not throw the stone through the door with an intent to steal and that he did not entertain such an intent when he thereafter went to the door. And in fact it appeared that he then was upon the dwelling to persuade or prevent her from calling the police as she indicated she would do. Since he was not upon the premises at the time he broke the dwelling and thereafter with an intent to steal, there remains only the circumstances of his being upon the Kessler dwelling prior thereto and the circumstances of his being upon the dwelling across the alley to support the conviction of the offense of being a rogue and vagabond. Those circumstances were simply that he knocked or pounded on the door and jiggled the door knob of each house. At the house across the alley he went to a cellar way, remaining only a few seconds. We do not think it was a rational inference from these circumstances, in the light of what followed, that Jett was upon either of the dwellings with an intent to steal. Without that inference there was no evidence of such intent and the court was clearly wrong in declaring Jett to be a rogue and vagabond. In so holding we have considered Jett's flight upon the appearance of the police. Flight from justice and its analogous conduct have always been deemed indicative of a conscious-

ness of guilt. They are admissible as evidence of consciousness of guilt, and thus of guilt itself. *McLean v. State,* 6 Md. App. 366, 369, quoting Wigmore, *Evidence,* § 276 (3rd Ed. 1940). We point out that Jett had thrown a stone through Mrs. Kessler's door, itself an unlawful act. Code, Art. 27, § 111. His flight may well have been consciousness of guilt of that offense, but in the circumstances it was not enough to show an intent to commit larceny, cf. *Wilson v. State,* 7 Md. App. 41.

We observe that being a rogue and vagabond is a misdemeanor carrying a sentence upon conviction of three years. Its elements must be proved as the elements of all other crimes must be proved—beyond a reasonable doubt. An intent to steal is an element of the rogue and vagabond statute here applicable. It cannot be here presumed or inferred from the mere presence of a person in or upon the designated areas or implied as a matter of law; it must be proved as a matter of fact. As we cannot say in the light of its comments that the evidence before the lower court either showed directly or supported a rational inference from which it could have been properly convinced beyond a reasonable doubt that Jett was upon either dwelling with an intent to steal goods or chattels, it was clearly erroneous in its judgment. Maryland Rule 1086; *Williams v. State,* 5 Md. App. 450. We cannot determine from the record whether or not additional probative evidence can be produced on a retrial, but we feel that the interests of justice require that we remand the case. We vacate the judgment and remand with directions to the trial court (a) to hold a new trial if the State within a specified time can satisfy the court that it can produce additional probative evidence, or (b) to enter a judgment of acquittal if the State cannot preliminarily so satisfy the court. *Gray v. State,* 254 Md. 385, 397.

> *Judgment vacated; case remanded for further proceedings in accordance with this opinion.*